2006-NMSC-016

135 P.3d 814

In the Matter Before the New Mexico Public Regulation Commission of the Application of Socorro Taxi, Inc., d/b/a American Transportation, for a Contract Motor Carrier Permit, Case No. 04–00228–TR–M.

T–N–T TAXI, LTD. Co., a New Mexico limited liability company, James P. Moore, d/b/a Dollar Cab Co., a sole proprietorship, and A–1 Taxi, Inc., Appellants,

v.

NEW MEXICO PUBLIC REGULATION COMMISSION, Appellee,

and

Socorro Taxi, Inc., d/b/a American Transportation, Real Party in Interest.

No. 28,996.

Supreme Court of New Mexico.

March 28, 2006.

Rehearing Denied May 1, 2006.

other things, had to consider "whether granting the permit would endanger or impair the operations of motor carriers protesting the application for a permit to an extent contrary to the public interest," NMSA 1978, Section 65–2A–10(C)(3) (2003) [1].

{2} Written notice of American's application was sent to potentially interested persons and the PRC published notice in the Albuquerque Journal. *See* NMSA 1978, § 65–2A–6 (2003). In the notices, all persons desiring to intervene, object or be heard regarding the application were instructed to file a Motion to Intervene with the PRC. T–N–T Taxi, Dollar Cab and A–1 Taxi ("Intervenors") were among many who were mailed notice as interested persons. Apparently wanting to object or be heard, Intervenors complied with the notice from the PRC and filed timely motion(s) to intervene as certificated intrastate common motor carriers of persons. In their motions, Intervenors allege that granting the permit would be contrary to the public's best interest, would impair their provision of services in the same territory sought to be serviced by American, and that the application by American is supported by fraudulent documents. American moved to strike the motions to intervene contending that NMSA 1978, Section 65–2A–13(B) (2003) precludes all common and contract motor carriers from protesting an application for a permit.

{3} The PRC agreed with American and denied the Intervenors' motions to intervene. The PRC entered a Final Order approving American's application, finding in part that the matter was uncontested. Intervenors appealed directly to this Court. *See* NMSA 1978, § 65–2A–35 (2006). We reverse and remand to the PRC for a hearing because the Motor Carrier Act at the time of American's application, when construed as a harmonious whole, requires the PRC to conduct a hearing when under Section 65–2A–10(C)(3) common motor carriers of persons protest an application for a permit. Intervenors qualify because they are certificated

Yarbro & Associates, P.A., Roger E. Yarbro, Cloudcroft, NM, for Appellants.

Lee W. Huffman, Santa Fe, NM, for Appellee.

Smith Law Offices, P.A., Jack A. Smith, Albuquerque, NM, for Real Party.

## OPINION

CHÁVEZ, Justice.

{1} Socorro Taxi Inc., d/b/a American Transportation, ("American") is an intrastate motor carrier of persons in New Mexico. In July 2004, American filed an application with the Public Regulation Commission ("PRC") for a permit to provide non-emergency medical transport services throughout New Mexico under a contract with the New Mexico Human Services Department. Before the permit could be granted, the PRC, among

1. Effective June 17, 2005, Subsection C(3) was amended to read "whether granting the permit would endanger or impair the operations of motor carriers to an extent contrary to the public interest" deleting the requirement that when considering the public interest the PRC consider only those operations of motor carriers who actually protest an application for a permit.

common motor carriers of persons servicing the same territory covered in American's application and have alleged that granting the permit would be contrary to the public's best interest.

**CONSTRUING THE MOTOR CARRIER ACT AS A HARMONIOUS WHOLE, MOTOR CARRIERS OF PERSONS OPERATING WITHIN THE SAME GEOGRAPHIC TERRITORY AS AN APPLICANT MAY PROTEST AN APPLICATION FOR A PERMIT TO PROTEST WHETHER GRANTING THE APPLICATION WOULD IMPAIR OR ENDANGER THEIR OPERATIONS CONTRARY TO THE PUBLIC INTEREST**

■ {4} Whether Intervenors may protest American's permit application turns on whether the Legislature intended to preclude all motor carriers from protesting an application for a permit under the Motor Carrier Act. The PRC concluded that by adding Section 65–2A–13(B) the Legislature intended to prohibit all motor carriers from protesting an application for a permit in furtherance of the legislative goal to streamline the regulation of motor carriers. *See* NMSA 1978 §§ 65–2A–2, 65–2A–5(B) (2003).

■ {5} When an administrative agency determines legislative intent we review de novo. *State v. Rivera,* 2004–NMSC–001, ¶ 9, 134 N.M. 768, 82 P.3d 939 (applying de novo review to determine ambiguity). The primary goal in interpreting a statute is to give effect to the Legislature's intent. *State v. Smith,* 2004–NMSC–032, ¶ 8, 136 N.M. 372, 98 P.3d 1022. We begin the search for legislative intent by looking first to the words chosen by the Legislature and the plain meaning of the Legislature's language, closely examining the overall structure of the statute, as well as the particular statute's function within a comprehensive legislative scheme. *Rivera,* 2004–NMSC–001, ¶ 13, 134 N.M. 768, 82 P.3d 939 (citing *Sims v. Sims,* 1996–NMSC–078, ¶ 21, 122 N.M. 618, 930 P.2d 153). Under the plain meaning rule, statutes are given effect as written without room for construction unless the language is doubtful, ambiguous, or adherence to the literal use of the words would lead to injustice,

absurdity or contradiction, in which case the statute is to be construed according to its obvious purpose. *Rivera,* 2004–NMSC–001, ¶ 10, 134 N.M. 768, 82 P.3d 939 (citing *State v. Jonathan M,* 109 N.M. 789, 790, 791 P.2d 64, 65 (1990) and quoting *State ex rel. Helman v. Gallegos,* 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994)). As will be seen, application of the plain meaning rule will lead to contradictions within the Motor Carrier Act. Therefore, in attempting to construe the Act consistent with legislative intent we must determine whether the Act may be interpreted as a harmonious whole. *Rivera,* 2004–NMSC–001, ¶ 13, 134 N.M. 768, 82 P.3d 939 (quoting *State v. Muniz,* 2003–NMSC–021, ¶ 14, 134 N.M. 152, 74 P.3d 86) ("Whenever possible ... we must read different legislative enactments as harmonious instead of as contradicting one another").

{6} There are three sections of the Act which require our interpretation since the first two may be contradicted by the third. The first, Section 65–2A–5(C), requires the PRC to conduct a hearing "whenever an interested person protests the application during the notice period." Section 65–2A–3(S), defines interested person as "a motor carrier operating over the routes or in the territory involved in an application." As instructed by the PRC in the mailed and published notice regarding American's application for a permit, Intervenors filed timely motions to intervene as certificated intrastate common motor carriers of persons operating in the territory involved in the application. The second provision, Section 65–2A–10(C)(3), requires the PRC to consider "whether granting the permit would endanger or impair the operations of motor carriers *protesting the application* for a permit to an extent contrary to the public interest." (Emphasis added). Intervenors have protested the application because they contend, among other things, that granting the application will endanger or impair their operations in a manner that would be contrary to the public interest. However, these provisions are called into question by the third provision, Section 65–2A–13(B), which provides that "a common or contract motor car-

rier shall not protest an application for a permit."

{7} The PRC and American contend that the legislative purpose for enacting Section 65–2A–13(B) was to streamline the permit process and, therefore, this subsection should be interpreted to repeal by implication subsections 5 and 10. Alternatively, they argue that Section 65–2A–13(B) is more specific and therefore should be given effect over Sections 65–2A–5 & 10. We do not agree. Repeals by implication are not favored and are not resorted to unless necessary to give effect to the legislative intent. *Citation Bingo, Ltd. v. Otten* 1996–NMSC–003, ¶¶ 21–24, 121 N.M. 205, 910 P.2d 281. In this case, a repeal by implication is not necessary because the provisions at issue may be construed harmoniously to effect the legislative intent. In addition, because these provisions may be construed harmoniously we decline the PRC's and American's invitation to interpret Section 65–2A–13(B) as a more specific section that should be given effect over Sections 65–2A–5 & 10. *City of Albuquerque v. New Mexico State Corp. Comm'n*, 93 N.M. 719, 721, 605 P.2d 227, 229 (1979) (the problem with applying the rule that specific sections of a statute govern over more general sections "is that one section is not readily identifiable as the more specific one of the two").

{8} Although our interpretation of the Motor Carrier Act is influenced by the legislative declaration that it sought to streamline the regulation of motor carriers, NMSA 1978, § 65–2A–2 (2003), we are not convinced that the Legislature wanted to streamline the regulation of motor carriers by having the PRC review all applications for permits as uncontested matters. Although the Legislature encouraged the PRC to streamline and simplify its process for approving applications, Section 65–2A–5(B), it also mandated the PRC to hold a public hearing on an application whenever an interested person protests the application during the notice period. § 65–2A–5(C). Section 65–2A–3(II) defines protest to mean "a document filed with the commission by an interested person that expresses an objection to a matter before the commission." As related to motor carriers, the Legislature limited interested persons to those motor carriers operating over the routes or in the territory involved in the application. § 65–2A–3(S). However, not just any motor carrier is an interested person entitled to file a protest, as confirmed by Section 65–2A–13(B). Indeed, had the Legislature not recognized in Section 65–2A–10(C)(3) that some motor carriers might protest, the search for legislative intent would be over and no motor carrier would be allowed to protest an application for a permit even if otherwise an interested person.

{9} However, the Legislature did acknowledge in Section 65–2A–10(C)(3) that some motor carriers might indeed protest. Perhaps a slip of the pen, but we think not. Section 65–2A–10(C)(3) imposes certain duties and responsibilities on the PRC before the PRC can grant a permit to a common motor carrier of persons. Under Section 65–2A–10(C)(3), the PRC must consider whether granting the permit would endanger or impair the operations of motor carriers protesting the application for a permit to an extent contrary to the public interest. Before the 2003 amendment, the PRC had to consider whether "the transportation to be provided under the permit is or will be consistent with the public interest." NMSA 1978, § 65–2–87(1981). The Legislature streamlined the application process in 2003 by limiting the scope of the public interest inquiry to an inquiry dependent on the filing of protests by motor carriers. If no motor carrier protested an application, the PRC was relieved of its responsibilities under Section 65–2A–10(C)(3). Stated differently, the PRC is directed to consider only the operations of those motor carriers who actually protest when evaluating whether granting the application will impair operations contrary to the public interest. Otherwise, if we rewrite Section 65–2A–10(C)(3) to exclude the words "protesting the application for a permit" as proposed by the PRC and American, the PRC would have to consider the effect on operations of motor carriers in general when measuring the effect on the public interest. We note that Intervenors are only three of one hundred and nine motor carriers operating in the same territory. Thus the operations of only three motor carriers not one

hundred and nine need to be considered by the PRC in considering the public interest. Our interpretation honors the legislative goal of streamlining the application process since before the 2003 amendments to the Motor Carrier Act, a permit could not be issued until after a mandatory public hearing was held. NMSA 1978, § 65–2–88(B)(1981).

{10} We also believe the 2005 amendment to Section 65–2A–10(C)(3) supports our analysis. The amendment expands the public interest analysis, yet the process is streamlined even further because the amendment now effectively precludes common motor carriers from protesting whether an application impairs or endangers the operations of motor carriers contrary to the public interest. Although the PRC must still assess whether the application for a permit is or will be consistent with the public interest, such a protest by a motor carrier is no longer recognized and as such intervention would not be appropriate and a hearing is not required for this purpose.

{11} We believe it also important that Intervenors filed their motions to intervene pursuant to the instructions provided them by the PRC in the notice of American's application. The PRC was presumably adhering to Commission Rule 27, which was in effect at the time of American's application.[2] Rule 27 grants an intervention of right whenever the moving party demonstrates a substantial interest in PRC actions. Since Intervenors have demonstrated a substantial interest as interested persons and as motor carriers whose operations and transportation services must be considered by the PRC before issuing a permit, we conclude that intervention was appropriate. *See Thriftway v. State*, 111 N.M. 763, 767, 810 P.2d 349, 353 (Ct.App. 1990) (indicating that when person(s) are adversely affected by the outcome of an agency action, and it will be difficult to protect that interest if intervention is not allowed, then, even absent statutory provisions intervention should be granted); *see also Pueblo Picuris v. New Mexico Energy and Natural Resources Dept.*, 2001–NMCA–084, ¶¶ 4, 10, 131

N.M. 166, 33 P.3d 916 (stating that the Pueblo was deemed to fall within the ambit of interested persons entitled to intervene in an agency permit proceeding because the Pueblo was located in the vicinity of the proposed permit area and opposed the permit as affecting its vital interests).

{12} In *Thriftway*, the Court of Appeals considered whether the Nageezi Chapter, a governmental unit of the Navajo Tribe, had a right to intervene in a San Juan County Commission proceeding where Thriftway's liquor license application was under consideration. Under the statute which governs applications relating to a liquor license, prior to approving an application, the Commission must consider whether approving the application would adversely affect the public health, safety, or morals of residents located in the territory covered by the application. Thriftway argued that the Nageezi did not have a special interest in their transfer action because as a Tribal government, the Nageezi were different from other members of the general public, and the statute applied only to municipalities, not to Chapters. Despite Thriftway's contention, and even though the transfer was on private land, the court held that the Nageezi Chapter could intervene because it was located within the same geographic territory to be affected by Thriftway's liquor license. The Court reasoned that the Nageezi's participation was necessary to Thriftway's action because they held a sufficient interest which would otherwise be jeopardized by the San Juan County Commission action.

{13} Like the Nageezi Chapter in *Thriftway*, Intervenors' operations and transportation services are in the same geographic location covered in American's permit application. The Motor Carrier Act requires the PRC to consider whether the operations of these motor carriers will be endangered or impaired to an extent contrary to the public interest. Intervenors, therefore, have a substantial interest in the proceedings regarding American's application for a permit. Because we conclude that the PRC must con-

2. Whether a protest can only be considered if the protesting party is allowed to intervene is not

before this court.

duct a hearing and grant Intervenors' motion to intervene, we do not need to reach the due process argument.

**CONCLUSION**

{14} Under the provisions of the Motor Carrier Act at the time of Intervenors' protest, motor carriers operating over the routes or in the territory involved in an application for a permit may protest an application for a permit to be heard on whether granting the permit would endanger or impair their operations contrary to the public interest. Under Commission Rule 27, such motor carriers have a right to intervene in the PRC proceedings and the PRC must conduct a public hearing on the application. We reverse and remand to the PRC for proceedings consistent with this opinion.

{15} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, PETRA JIMENEZ MAES, Justices and RICHARD C. BOSSON, Chief Justice (dissenting).

MINZNER, Justice (dissenting).

{16} I respectfully dissent. I would hold that NMSA 1978, Section 65–2A–13 (2003), does not permit common or contract motor carriers to protest an application for a permit or for a change in a permit, and therefore I would affirm the Public Regulatory Commission's final order denying the motions of T–N–T Taxi, Ltd. Co. and others to intervene in the permit application filed by Socorro Taxi, Inc. d/b/a American Transportation. The majority has not persuaded me that the Legislature intended to create any exceptions to

its rule in Section 65–2A–13(B) and I would conclude that T–N–T's protest is barred.

{17} When interpreting a statute, our primary goal is to give effect to the Legislature's intent. *See State v. Smith*, 2004–NMSC–032, ¶ 8, 136 N.M. 372, 98 P.3d 1022; *Block v. Vigil–Giron*, 2004–NMSC–003, ¶ 4, 135 N.M. 24, 84 P.3d 72. I have several reasons for concluding that the Legislature intended to prevent common carriers like T–N–T from protesting permit applications. First, the language relating to permit applications appears clear on its face. "A common or contract motor carrier shall not protest an application for a permit or for a change in a permit." Section 65–2A–13(B). In addition, Section 65–2A–13, when read as a whole, appears to have a single purpose, to limit protests.[1] Each subsection of the statute limits a particular category of protests. The comprehensiveness of the statute suggests that it was intended as a definitive statement regarding when motor carriers may protest applications made by their competitors. The limited exception created by subsection (C) illustrates this comprehensiveness. If the Legislature had intended to create other exceptions to the rules set out in Section 65–2A–13, it seems likely that it would have included them in this statute, as it did with subsection (C). Finally, this limitation on protests by motor carriers is consistent with the Legislature's stated purpose of "streamlining and promoting uniformity of state regulation of motor carriers." NMSA 1978, § 65–2A–2 (2003).

{18} Because the text of a statute provides us with the best evidence of the intent of the Legislature, we depart from the meaning of

---

1. Section 65–2A–13 provides as follows:
   A. contract motor carrier shall not protest an application for a certificate or for a change in a certificate.
   B. A common or contract motor carrier shall not protest an application for a permit or for a change in a permit.
   C. A common motor carrier shall not protest an application for a certificate or for a change in a certificate unless:
   (1) it possesses authority to handle, in whole or in part, the traffic for which the applicant seeks authority, or it has pending before the commission an application for authority for substantially the same traffic filed prior to the application to be protested; and

(2) it is willing and able to provide service that meets the reasonable needs of the customers or shippers involved; and
(3) it has provided service within the scope of the protested application during the previous twelve-month period, or has actively and in good faith solicited service within the scope of the protested application during such period; or
(4) the commission grants leave to intervene upon a showing of other interests that are not contrary to the provisions of the Motor Carrier Act [65–2A–1 to 65–2A–40 NMSA 1978].

an unambiguous statute only if we are persuaded that the obvious or natural interpretation of the text is inconsistent with the actual intent of the Legislature. *See State ex rel. Helman v. Gallegos,* 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994) (observing that consideration of the history and background of a statute, the structure of a statute, and the statute's place within a comprehensive legislative scheme may in some cases give rise to "genuine uncertainty as to what the legislature was trying to accomplish").

{19} The majority concludes that the Legislature's intention was not fully captured by the text of Section 65–2A–13 because NMSA 1978 Sections 65–2A–5(C) (2003) and 65–2A–10(C)(3) (2003, prior to 2005 amendment) refer to protests that Section 65–2A–13 largely eliminates, which creates a conflict within the statutory scheme. The Legislature has enacted the Uniform Statute and Rule Construction Act, *see* NMSA 1978, 12–2A–1, which offers some guidance regarding the construction of statutes and the Legislature's intent in situations where statutes appear to conflict. Section 12–2A–10(A) provides:

> If statutes appear to conflict, they must be construed, if possible, to give effect to each. If the conflict is irreconcilable, the later-enacted statute prevails. However, an earlier-enacted specific, special or local statute prevails over a later-enacted general statute unless the context of the later-enacted statute indicates otherwise.

NMSA 1978, § 12–2A–10(A) (1997). I believe the apparent conflict in these statutes can be reconciled while still giving full effect to the prohibition in Section 65–2A–13, and that this interpretation is more consistent with the legislative intent than the interpretation adopted by the majority.

{20} First, Section 65–2A–5(C) instructs the Commission to hold a hearing when an interested person protests an application. Although Section 65–2A–13 significantly reduces the number of protests that may be filed, it does not wholly eliminate protests. Any tension between these sections is resolved by recognizing that a hearing must be held when a protest that is not prohibited by Section 65–2A–13 is filed. Second, in 2003, Section 65–2A–10(C)(3) required the Commission to consider "whether granting the permit would endanger or impair the operations of motor carriers protesting the application for a permit to an extent contrary to the public interest." Thus, in 2003, the Legislature had ordered the Commission to consider the impact of the proposed permit on protesting motor carriers even though no motor carriers are permitted to protest an application for a permit under Section 65–2A–13. While this is an odd result, the sections are not in direct conflict. Section 65–2A–10(C) simply addresses a situation which, after the addition of Section 65–2A–13, will no longer occur. Although Section 65–2A–10(C) was enacted at the same time as Section 65–2A–13, as the hearing examiner observed in his order denying the motions to intervene, Section 65–2A–10 "is substantially similar in both format and language to" a comparable provision of its predecessor, enacted in 1981. Section 65–2A–13, on the other hand, appears to be entirely new. I would treat Section 65–2A–13 as the later-enacted statute under Section 12–2A–10(A) and give it full effect to the extent that there is any conflict with Section 65–2A–10(C).

{21} Interestingly, in the face of this potential conflict the Legislature did not choose to alter Section 65–2A–13 to emphasize the right of motor carriers to appear before the Commission. Instead, in 2005, it deleted the phrase "protesting the application for a permit" from Section 65–2A–10(C)(3). *Compare* § 65–2A–10(C)(3) (2003, prior to 2005 amendment), *with* § 65–2A–10(C)(3) (2005). It seems reasonable to conclude that the Legislature took this action to remove language it determined was superfluous after the addition of Section 65–2A–13 in 2003.

{22} I believe that the majority's resolution of the conflict within the statutory scheme does not give full effect to the Legislature's intent. In creating this statute, I am persuaded the Legislature made a policy decision to move away from a formal, adversarial application process and prohibit formal protests by most potential competitors. The Legislature chose between the competing goals of simplifying the application process and fully informing the Commission, and decided in favor of simplifying the application

process. While the holding the majority reaches may serve better the interests of competitors, I respectfully suggest the Legislature made a different choice, to which we should defer. Unlike *Thriftway Marketing Corp. v. State,* 111 N.M. 763, 764, 810 P.2d 349, 350 (Ct.App.1990), this is not a case in which we have the discretion to permit intervention. The specificity of Section 65–2A–13 seems to preclude implying a right to protest on the basis of Section 65–2A–10(C)(3). I would view the former as comparable to a comprehensive statement about standing, making an implied right in Section 65–2A–10(C)(3) inappropriate. *Cf.* NMSA 1978, § 12–2A–10(C) (1997) (providing that a comprehensive revision prevails over previous statutes, even if irreconcilably conflicting).

{23} For these reasons, I would affirm the Commission's order. A majority of the Court being of a different view, I respectfully dissent.

I CONCUR: RICHARD C. BOSSON, Chief Justice.