## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2022-NMCA-047**

**Filing Date: November 9, 2021**

**No. A-1-CA-38232**

**NEW MEXICO BOYS AND GIRLS RANCH
and EL RANCHITO DE LOS NINOS,**

     Plaintiffs-Appellees.

v.

**NEW MEXICO BOARD OF PHARMACY,**

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY
James Lawrence Sanchez, District Judge**

Domenici Law Firm, P.C.
Pete V. Domenici, Jr.
Reed C. Easterwood
Albuquerque, NM

for Appellees

Hector H. Balderas, Attorney General
Delilah Tenorio, Assistant Attorney General
Santa Fe, NM

for Appellant

## OPINION

**MEDINA, Judge.**

**{1}**    The New Mexico Board of Pharmacy (the Board) appeals the district court's permanent injunction prohibiting it from enforcing the Pharmacy Act (the Act), NMSA 1978, §§ 61-11-1 to -29 (1969, as amended through 2021)[1] and 16.19.17 NMAC against New Mexico Boys and Girls Ranch and El Ranchito de Los Ninos (collectively, the Ranches). The Board makes three arguments: (1) the district court lacked subject matter jurisdiction to issue a decision on the Ranches' complaint and abused its

---

1The Act is repealed effective July 1, 2024. Section 61-11-29.

discretion when it issued a permanent injunction against the Board; (2) the Act requires the Ranches to hold a pharmacy license; and (3) the Board acted within the scope of its authority when promulgating the definition of "custodial care facility" at 16.19.11.7(B) NMAC. We affirm, holding that the Act does not apply to community care homes licensed under 8.26.6 NMAC.

**BACKGROUND**

{2}     The parties do not dispute the material facts. The Ranches are facilities that provide full-time care to New Mexico children in need. Both facilities are licensed by the Children, Youth and Families Department (CYFD) as community homes. Prior to 2014, 7.8.3 NMAC governed the Ranches' CYFD licensure and required them to obtain a pharmacy license from the Board. *See* 7.8.3.82 NMAC (Regulations Governing Community Homes); 7.8.3.95(B) NMAC ("Facilities providing services which require regular use of controlled and/or prescription medication for the children under care must hold and display an appropriate drug permit as determined by the State Board of Pharmacy."). In 2014, CYFD issued new regulations for "Community Home Licensing Standards" at 8.26.6 NMAC. *See* 8.26.6.5 NMAC (providing an effective date of August 29, 2014 for the Community Home Licensing Standards). The new regulations "supersede[d] Sections 82 through 127 of 7.8.3 NMAC[,]" including the pharmacy licensure requirement, and became the exclusive standards for licensing community homes. 8.26.6.6 NMAC. Following the adoption of 8.26.6 NMAC, the Ranches did not renew their pharmacy license.

{3}     In 2017, the Board notified the Ranches they needed a pharmacy license to maintain their CYFD licenses because they were considered "custodial care facilities" under both the Act, Section 61-11-2(F), and the Nursing Home Drug Control regulations, 16.19.11.7(B) NMAC. The Act defines a "custodial care facility" as "a nursing home, retirement care, mental care or other facility that provides extended health care[,]" and the Nursing Home Drug Control Regulations, promulgated by the Board, define "Licensed Custodial Care Facility" as "[a]ny facility or business, including non-profit entity which provides care and services on a continuing basis, for two or more in-house residents, not related to the operator, and which maintains custody of the residents' drugs." 16.19.11.7(B) NMAC; *see* § 61-11-2(F).

{4}     The Ranches responded to the Board and explained that they were not required to hold a pharmacy license because they were not custodial care facilities, but rather community homes regulated under 8.26.6 NMAC. The Community Home Licensing Standards defines "[c]ommunity home" as "a facility which operates [twenty-four] hours a day and provides full time care, supervision and support to no more than [sixteen] children in a single residential building, and which meets the definition of 'group home' as outlined in the Human Services Department Act, NMSA 1978, [§] 9-8-13 [(2007)]." 8.26.6.7(D) NMAC. The Human Services Department Act defines a group home, in relevant part, as "any home[,] the principal function of which is to care for a group of children on a twenty-four-hour-a-day residential basis . . . and that is a member of any state or national association that requires it to observe standards comparable to

pertinent recognized state or national group home standards for the care of children . . . or that is certified by any such organization as complying with such standards." Section 9-8-13.

**{5}**     CYFD then contacted El Ranchito de los Ninos and directed them to comply with the Board's regulations and obtain a pharmacy license. CYFD indicated that failure to do so would affect El Ranchito de los Ninos' licensure status as a community home and that its license may be suspended or revoked. In response, the Ranches filed a complaint in district court seeking declaratory and injunctive relief to prevent the Act and the Board's regulations from applying to the Ranches. CYFD did relicense the Ranches between the filing of the complaint and this appeal. However, CYFD noted that the Ranches' failure to obtain a pharmacy license was a substantial deficiency and that the Ranches were expected to obtain a pharmacy license should the outcome of this case require it.

**{6}**     The Board denied the Ranches' assertion that the revised community home licensing standards superseded the Board's authority to require the Ranches to obtain a pharmacy license. The Board stated that, pursuant to the Act, the Ranches have always been required to obtain a pharmacy license from the Board.

**Injunction Hearing**

**{7}**     At the hearing on the Ranches' complaint, the Ranches argued that they are community homes and not one of the facilities defined in the Act. The Ranches noted that requiring them to obtain a pharmacy license would create a duplicate system of oversight, because the community home licensing standards already require the Ranches to conform to certain health and safety standards for administering and storing medication. *See* 8.26.6.15(K) NMAC (addressing administration and storage of prescription medication at community homes). The Ranches asserted and presented testimony that they do not provide extended health care and, at most, occasionally administer medication prescribed by an unconnected provider to their residents.

**{8}**     The Board responded that the Ranches are considered custodial care facilities under the Act regardless of whether the Ranches are also community homes. The Board noted that prescription medication is considered a dangerous drug under the Act and that facilities must be licensed to store and administer dangerous drugs. *See* § 61-11-2(G) (" '[D]angerous drug' means a drug that is required . . . to be dispensed pursuant to a prescription or is restricted to use by licensed practitioners[.]"). The Board argued that because the Ranches store and administer prescription medication, they therefore store dangerous drugs and are required to obtain a pharmacy license.

**{9}**     The district court determined that, pursuant to the Declaratory Judgment Act (the DJA), NMSA 1978, §§ 44-6-1 to -15 (1975), an actual controversy existed, giving the district court jurisdiction over the Ranches' complaint. The district court granted declaratory and injunctive relief in the Ranches' favor, concluding in relevant part that the Ranches "are not required to obtain, possess, or maintain [a license from the Board]

to continue in business as a licensed community home"; "[t]he requirement of [a license from the Board] for a custodial care facility is not required by applicable statutory language"; [the Board's] regulatory requirement of a New Mexico Board of Pharmacy is beyond the legislative authority as stated in [the Act]"; and "[the Ranches] are not required to obtain a [license from the Board] as a foster care facility, custodial care facility, or to obtain a license under the dangerous drugs regulation . . . 16.19.17 [NMAC]". This appeal followed.

## DISCUSSION

**{10}**    We first address the threshold questions of jurisdiction and injunctive relief. We then turn to the issues of statutory interpretation and regulatory authority.

### Subject Matter Jurisdiction

**{11}**    The Board asserts no actual controversy exists and therefore the district court lacked subject matter jurisdiction to issue a decision on the complaint for declaratory judgment and permanent injunction. Jurisdictional issues present a question of law that we review de novo. *Smith v. City of Santa Fe*, 2007-NMSC-055, ¶ 10, 142 N.M. 786, 171 P.3d 300. Under the DJA, a justiciable controversy is a necessary precondition to invoke a court's jurisdiction to decide a declaratory judgment action. *Am. Fed'n of State, Cnty. & Mun. Emps. v. Bd. of Cnty. Comm'rs of Bernalillo Cnty.*, 2016-NMSC-017, ¶ 15, 373 P.3d 989. Justiciable controversies exist where the issue raised by the plaintiff is ripe for litigation and the plaintiff has standing. *Id.* ¶ 17.

**{12}**    The ripeness requirement "is and always has been to conserve judicial machinery for problems which are real and present or imminent, not to squander it on abstract or hypothetical or remote problems." *Id.* ¶ 18 (internal quotation marks and citation omitted). The ripeness analysis normally involves a finding of fitness for review and a cognizable hardship to the parties of withholding court consideration. *Id.* ¶ 19. "Fitness is concerned with whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." *Id.* ¶ 20 (internal quotation marks and citation omitted). "The hallmark of [a] cognizable hardship is usually direct and immediate harm." *Id.* ¶ 28 (internal quotation marks and citation omitted).

**{13}**    "The standing question bears close affinity to questions of ripeness—whether the harm asserted has matured sufficiently to warrant judicial intervention." *Id.* ¶ 31 (internal quotation marks and citation omitted). To obtain standing in New Mexico, a litigant must allege an injury-in-fact, meaning they are faced with a real risk of future injury due to the challenged action, statute, or regulation. *Id.* ¶ 32. Here, the ripeness and standing inquiries converge because this case involves pre-enforcement review of an agency's action and the possibility of future injury. *See id.* ¶ 31 ("In some cases, the issues of standing and ripeness will completely overlap." (internal quotation marks and citation omitted)).

**{14}** The Board challenges the ripeness of the controversy and the Ranches' standing, asserting the Ranches failed to allege an immediate or imminent harm that would result from the enforcement of the Board's regulations. The Ranches respond that the letter from CYFD threatening to "suspend or revoke" El Ranchito de Los Ninos' CYFD license if El Ranchito did not apply for a pharmacy license within thirty days is a direct and imminent harm and an imminently threatened injury. Additionally, CYFD found the Ranches to be out of compliance with the community home licensing standards in the community home agency licensing report it issued after the Ranches filed their complaint. CYFD noted that the Ranches' lack of a pharmacy license was a substantial deficiency, meaning that the Ranches are currently out of compliance with 8.26.6 NMAC and are subject to license suspension or revocation. *See* 8.26.6.7(J) NMAC (defining "[d]eficiency" as "non-compliance with 8.26.6 NMAC" and "[s]ubstantial deficiencies" as "deficiencies that impair the safety, permanency or well-being of a child"); 8.26.6.13 NMAC (describing sanctions, including suspension or revocation of community home license, that may result if CYFD determines "a community home has failed to comply with 8.26.6 NMAC"). Therefore, CYFD has made an adverse finding against the Ranches due to noncompliance with the Board's regulations, threatening the Ranches' ability to continue operating.

**{15}** Based on the foregoing, we agree with the Ranches. The CYFD letter and licensing report demonstrate a direct and imminent harm to the Ranches—sanctions imposed on their CYFD licenses—due to the Board's regulations, sufficient to establish standing. *See* 8.26.6.13(A) NMAC (discussing sanctions against community homes). "[O]nce the party seeking review alleges he himself is among the injured, the extent of the injury can be very slight." *De Vargas Sav. & Loan Ass'n v. Campbell*, 1975-NMSC-026, ¶ 12, 87 N.M. 469, 535 P.2d 1320. We conclude that the Ranches' complaint was ripe and that the Ranches had standing to pursue relief in court, thereby satisfying the justiciable controversy requirement of the DJA.

**Declaratory Relief**

**{16}** The Board also argues that the district court erred in granting the Ranches a permanent injunction. In addition to a declaratory judgment, the district court has discretion to grant injunctive relief. *See Hines Corp. v. City of Albuquerque*, 1980-NMSC-107, ¶ 13, 95 N.M. 311, 621 P.2d 1116. Injunctions are drastic remedies and should only be issued "where there is a showing of irreparable injury for which there is no adequate and complete remedy at law." *State ex rel. State Highway & Transp. Dep't of N.M. v. City of Sunland Park*, 2000-NMCA-044, ¶ 18, 129 N.M. 151, 3 P.3d 128 (internal quotation marks and citation omitted). The injury must be actual and substantial or imminently threatened, and a mere possibility of harm is not sufficient. *Id.* ¶ 19. We review a grant of equitable relief for abuse of discretion, and will not reverse unless a clear abuse of discretion is shown. *Padilla v. Lawrence*, 1984-NMCA-064, ¶ 22, 101 N.M. 556, 685 P.2d 964.

**{17}** Regarding the district court's grant of equitable relief, the Board argues that the Ranches failed to allege that no adequate or complete remedies were available to them

under the law. We disagree. The Ranches' options outside seeking relief in court were to comply with the Board's regulations or face sanctions from CYFD. CYFD demonstrated it will issue sanctions if this Court determines community homes are subject to the Act and the Ranches fail to obtain a pharmacy license. The Ranches are threatened with an imminent injury with unascertainable monetary damages that will not cease until this controversy is decided. *See, e.g.*, *Hines Corp.*, 1980-NMSC-107, ¶ 13 ("In the present case the hardship suffered by [the] defendants was not clearly ascertainable. Nor was [the] plaintiff's hardship measureable by reasonably certain monetary damages. We therefore cannot say that the court abused its discretion.").

**{18}**    We do not believe that the Ranches must wait for CYFD sanctions before they seek relief. Therefore, we next address the propriety of the district court's granting a declaratory judgment and permanent injunction.

**Custodial Care Facilities and Community Homes**

**{19}**    The Board's claim that the district court erred in granting the declaratory judgment and permanent injunction turns in part on whether the Ranches fall within the definition of custodial care facilities under the Act. We therefore interpret custodial care facilities as defined under Section 61-11-2(F). This is a question of law that we review de novo. *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 10, 309 P.3d 1047. Our primary goal when interpreting statutory language is "to give effect to the Legislature's intent." *Rutherford v. Chaves Cnty.*, 2003-NMSC-010, ¶ 11, 133 N.M. 756, 69 P.3d 1199. When interpreting a statute, we first look to its plain language and give the words their ordinary meaning, unless the Legislature indicates a different one was intended. *Baker*, 2013-NMSC-043, ¶ 11 ("We use the plain language of the statute as the primary indicator of legislative intent." (alterations, internal quotation marks, and citation omitted)). "Under the plain meaning rule, statutes are given effect as written without room for construction unless the language is doubtful, ambiguous, or adherence to the literal use of the words would lead to injustice, absurdity or contradiction, in which case the statute is to be construed according to its obvious purpose." *T-N-T Taxi, Ltd. v. N.M. Pub. Regul. Comm'n*, 2006-NMSC-016, ¶ 5, 139 N.M. 550, 135 P.3d 814; *accord State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352.

**{20}**    The Act defines "custodial care facility" as "a nursing home, retirement care, mental care or other facility that provides extended health care[.]" Section 61-11-2(F). The Board contends the Ranches fall within the definition of a custodial care facility because the Ranches (1) maintain or restore the physical, mental, or emotional well-being of their residents; (2) administer medication to their residents; and (3) maintain a relationship with consultant pharmacists.

**{21}**    The Ranches contend that extended health care must be construed as similar to the type of care provided in nursing homes, retirement and mental care facilities. The Ranches argue they do not fall under the definition of custodial care facility because they are not similar to the facilities enumerated in Section 61-11-2(F) and do not provide the type of health care provided in those facilities to their residents, which consists of

children without specific health care needs, beyond usual childhood illnesses. Neither the Board nor the Ranches cite to any persuasive authority defining "extended health care," nor does the Act define "extended health care." *See* § 61-11-2 (listing definitions applicable to the Act). Because the Board is the agency charged with enforcing the statute at issue, we begin with examining the Board's interpretation in the context of the Legislature's purpose for enacting the Act. *See Baker,* 2013-NMSC-043, ¶ 15. If the Board's interpretation leads to an absurd result or conflicts with the Legislature's purpose, we cannot conclude its interpretation reflects legislative intent. *Id.*; *see also Rutherford*, 2003-NMSC-010, ¶ 24 ("Statutes are to be read in a way that facilitates their operation and the achievement of their goals.").

**{22}**   The Legislature's stated purpose for enacting the Act is

>   to promote, preserve and protect the public health, safety and welfare by and through the effective control and regulation of the practice of pharmacy, including the licensure of pharmacists and pharmacist interns and registration of pharmacy technicians; the licensure, control and regulation of all sites or persons, in or out of state, who distribute, manufacture or sell drugs or devices used in the dispensing and administration of drugs in New Mexico; and the regulation and control of such other materials as may be used in the diagnosis, treatment and prevention of injury, illness or disease of a patient or other person.

Section 61-11-1.1(B). To effect this purpose, the Legislature enacted a comprehensive scheme addressing drug dispensation, record keeping, licensing of pharmacists and pharmacies, and created the Board to enforce the provisions of the Act. Section 61-11-6(A); *see generally* §§ 61-11-1 to -29. The Board's numerous powers all pertain to the practice of pharmacy and the licensure of individuals and facilities engaged in this practice. *See generally* § 61-11-6 (listing the duties and powers of the Board). The Act defines the "practice of pharmacy" as

>   the evaluation and implementation of a lawful order of a licensed practitioner; the dispensing of prescriptions; the participation in drug and device selection or drug administration that has been ordered by a licensed practitioner, drug regimen reviews and drug or drug-related research; the administering or prescribing of dangerous drug therapy; the provision of patient counseling and pharmaceutical care; the responsibility for compounding and labeling of drugs and devices; the proper and safe storage of drugs and devices; and the maintenance of proper records.

Section 61-11-2(CC).

**{23}**   The Board argues that because the Ranches store prescription medication, maintain records of this medication, and administer this medication to their residents, the Ranches are engaged in the practice of pharmacy and must be licensed by the Board. However, "all provisions of a statute, together with other statutes in pari materia,

must be read together to ascertain the legislative intent." *N.M. Bd. of Veterinary Med. v. Riegger*, 2007-NMSC-044, ¶ 13, 142 N.M. 248, 164 P.3d 947 (internal quotation marks and citation omitted). Therefore, we consider Section 61-11-2(CC) and the Board's assertion in the context of the Act as a whole. *See High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶ 5, 126 N.M. 413, 970 P.2d 599 ("[W]here several sections of a statute are involved, they must be read together so that all parts are given effect."). If the Act's purpose is effective control and regulation of pharmacists and pharmacies, facilities that manufacture or distribute drugs, and other like facilities and materials that address diagnosis and treatment of injury and illness, then the Ranches' storage and administration of prescription medication and related record keeping only qualifies as the practice of pharmacy if the Ranches are, as the Board argues, custodial care facilities. *See* § 61-11-1.1(B) (stating the purpose of the Act). We are not persuaded by the Board's arguments.

**{24}**    First, children are not placed with the Ranches for health care purposes. *See* § 9-8-13 (defining "group home" as any home in which "the principal function of which is to care for a group of children on a twenty-four-hour-a-day residential basis"); 8.26.6.7(D) NMAC (defining "[c]ommunity home" as "a facility which operates [twenty-four] hours a day and provides full time care, supervision and support to no more than [sixteen] children in a single residential building, and which meets the definition of 'group home' as outlined in . . . [Section] 9-8-13"). Second, the Ranches do not provide medical care. Whenever a resident needs care, the Ranches' staff takes the resident off site to see a medical professional. Third, the Ranches do not retain nurses or doctors on staff. Any prescription medication located on site has been prescribed by an unconnected medical professional, and the Ranches' staff follow that professional's instructions when giving that medication to their residents as anyone caring for a child would. Fourth, and of particular pertinence to our analysis, the primary purpose of community homes is to care for children's basic needs, not provide them with extended health care or prescribe them medications. *See* § 9-8-13. To the extent children have needs for prescription medication, such needs are secondary to the primary purpose of their placement and care at the Ranches.

**{25}**    We follow the doctrine of ejusdem generis when interpreting statutes, meaning "where general words follow an enumeration of persons or things of a particular and specific meaning, the general words are not construed in their widest extent but are instead construed as applying to persons or things of the same kind or class as those specifically mentioned." *State v. Off. of Pub. Def. ex rel. Muqqddin*, 2012-NMSC-029, ¶ 29, 285 P.3d 622 (internal quotation marks and citation omitted). A "custodial care facility" is "a nursing home, retirement care, mental care *or* other facility that provides extended health care[.]" Section 61-11-2(F) (emphasis added). The Board's interpretation of "other facility that provides extended health care" to include the Ranches does not logically comport with or bear significant similarity to the other facilities in Section 61-11-2(F).

**{26}**    If we take the Board's interpretation to its conclusion, "other facility that provides extended health care" includes any facility that provides ongoing care for individuals that

take medication. *Id.* We will not parse the Legislature's words in the literal and mechanical manner that the Board proposes. *See Baker*, 2013-NMSC-043, ¶ 30 ("We will not rest our conclusions upon the plain meaning of the language if the intention of the Legislature suggests a meaning different from that suggested by the literal language of the law." (alteration, internal quotation marks, and citation omitted)). We conclude that community homes are not facilities that provide extended health care and therefore are not custodial care facilities as defined in Section 61-11-2(F).

{27}    Having determined that community homes are not custodial care facilities, we return to the Board's argument that the Ranches are engaged in the practice of pharmacy because they store prescription medication on site and keep records of such medication. The Board contends that the Ranches must obtain a pharmacy license because the Board must provide for the licensing of "all places where dangerous drugs are stored, distributed, dispensed or administered[,]" and the Ranches store and administer dangerous drugs—prescription medication. Section 61-11-6(A)(6); *see also* § 61-11-2(G) (defining "dangerous drug").

{28}    The Board's interpretation separates one provision from the statute as a whole. Reading Section 61-11-6(A)(6) in its entirety, the Act directs the Board to license pharmacies, drug distributors, drug manufacturers, health clinics, and other facilities of a similar character. *See* § 61-11-6(A)(6) (directing the Board to "provide for the licensing of retail pharmacies, nonresident pharmacies, wholesale drug distributors, drug manufacturers, hospital pharmacies, nursing home drug facilities, industrial and public health clinics and all places where dangerous drugs are stored, distributed, dispensed or administered"). The Ranches are not one of the facilities the Board must license, and appear to be dissimilar from such facilities based upon the distinct purpose of the Ranches, which are primarily purposed to provide safe care and not medical or health care.

{29}    Additionally, we agree with the Ranches that CYFD already oversees the Ranches' use and storage of prescription medication. When CYFD enacted the community home licensing standards in 2014, it created a health and safety checklist that governs community homes. 8.26.6.15 NMAC. This checklist addresses a variety of health and safety considerations, including medical care and medication administration. 8.26.6.15(J), (K) NMAC. CYFD requires community homes to obtain timely medical care for their residents, to only administer medication as prescribed and directed by a medical professional, and to store medications separately from food and cleaning agents in a location not easily accessed by children. *Id.* Before a community home receives a license, CYFD must verify that the facility complies with 8.26.6 NMAC and issue written approval. 8.26.6.10(A) NMAC; 8.26.6.11 NMAC. Further, a community home's license cannot be renewed without CYFD on-site review. 8.26.6.11 NMAC; 8.26.6.12(B) NMAC. A community home license has a minimum duration of six months and a maximum duration of two years, with a standard license lasting for one year. 8.26.6.10(A)-(C) NMAC. Thus, CYFD regularly reviews the Ranches and other community homes, at most every six months and at least every two years, to ensure

they properly handle medication and will not issue or renew a license without doing so. 8.26.6.10(A)-(C) NMAC; 8.26.6.12(B) NMAC.

**{30}** In light of the Act's purpose—the effective control and regulation of the practice of pharmacy—and the Board's duties, we hold the Legislature did not intend the Act to apply to all facilities that provide care for individuals for an extended period of time, regardless of whether those facilities practice pharmacy. *See* § 61-11-1.1(B) (stating the purpose of the Act). We affirm the decision of the district court and hold that community homes are not required to obtain a pharmacy license to operate.

**The Board's Authority to Define "Custodial Care Facility"**

**{31}** Finally, we address the Board's authority to define "custodial care facility" as it has done at 16.19.11.7(B) NMAC. The statutory interpretation of the agency charged with administering the statute is persuasive, but not binding. *N.M. Pharm. Ass'n v. State*, 1987-NMSC-054, ¶ 6, 106 N.M. 73, 738 P.2d 1318. We may substitute our own independent judgment for that of the agency because it is the function of the courts to interpret the law. *Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 1995-NMSC-062, ¶ 11, 120 N.M. 579, 904 P.2d 28. "We must examine [the agency's] interpretation in the context of the statute as a whole, including the purposes and consequences of the [statute]." *Baker*, 2013-NMSC-043, ¶ 15. "[We] will overturn a clearly incorrect administrative interpretation." *N.M. Pharm. Ass'n*, 1987-NMSC-054, ¶ 6.

**{32}** The Legislature authorized the Board to adopt rules and regulations for the purposes of carrying out the Act, including the ability to define and limit classes of licenses. Sections 61-11-6(A), -14(B). This includes licenses for custodial care facilities, which, as discussed, are statutorily defined as "nursing home[s], retirement care, mental care or other facilit[ies] that provide[] extended health care." Section 61-11-2(F). The Board's regulations define "custodial care facility"[2] as "[a]ny facility or business, including non-profit entity which provides care and services on a continuing basis, for two or more in-house residents, not related to the operator, and which maintains custody of the residents' drugs." 16.19.11.7(B) NMAC. In effect, the Board attempts to expand the definition of "custodial care facility" beyond what was intended by the Legislature.

**{33}** The Board argues that adopting this definition falls within its express statutory authority to define license classifications. However, the Act authorizes the Board to "define[] and limit[]," not to impermissibly broaden or rewrite, an existing definition. Section 61-11-14(B). The Legislature clearly defined "custodial care facility" in Section 61-11-2(F), and the Board's administrative rule must yield to that definition. *See Family Dental Ctr. of N.M., P.C. v. N.M. Bd. of Dentistry*, 1982-NMSC-020, ¶ 9, 97 N.M. 464, 641 P.2d 495 ("If an agency, to whom the Legislature has delegated authority to promulgate rules and regulations within the guidelines set by the Legislature,

---

2We note that the Board has specifically defined "licensed custodial care facility," but this addition does not affect our analysis and decision. *See* 16.19.11.7(B) NMAC.

promulgates rules which are broader than the guidelines set by the Legislature, the agency rules must yield to the guidelines."). We hold that the Board acted outside its statutory authority in defining "custodial care facility" in 16.19.11.7(B) NMAC in a manner that excessively expanded upon the Act's provisions, and that the Board's definition is therefore void.

**CONCLUSION**

**{34}** We hold that the district court had subject matter jurisdiction over this case and that it did not abuse its discretion in granting the Ranches a declaratory judgment and permanent injunction. We also hold community homes are not custodial care facilities as defined at Section 61-11-2(F) of the Act. Finally, we hold the Board exceeded its regulatory authority when it expanded the definition of "custodial care facility" in 16.19.11.7(B) NMAC. For the foregoing reasons, the decision of the district court is affirmed.

**{35}   IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**KRISTINA BOGARDUS, Judge**